E-FILED
Monday, 16 March, 2026  01:21:38 PM
Clerk, U.S. District Court, ILCD

## IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
## SPRINGFIELD DIVISION

| | | |
|---|---|---|
| **CURRAN-GARDNER TOWNSHIPS PUBLIC WATER DISTRICT,** Sangamon County, Illinois, | ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **Case No. 23-cv-3250** |
| **CITY OF SPRINGFIELD, ILLINOIS,** | ) ) | |
| Defendant. | ) | |

## OPINION AND ORDER

**SUE E. MYERSCOUGH, U.S. District Judge:**

Now before the Court are Plaintiff Curran-Gardner Townships Public Water District's ("Curran-Gardner") Motion for Partial Summary Judgment (d/e 38) and Brief in Support (d/e 39) and Defendant City of Springfield's ("Springfield") Cross Motion for Summary Judgment (d/e 41) and Memorandum of Law in Support (d/e 42). For the reasons set forth, Curran-Gardner's Motion for Partial Summary Judgment (d/e 38) is DENIED and Springfield's Cross Motion for Summary Judgment (d/e 41) is GRANTED in part and DENIED in part.

## I.    BACKGROUND

The Court draws the following facts from the parties' statements of undisputed facts. The Court discusses any material factual disputes in its analysis.

Springfield is a municipality located in Sangamon County, Illinois, that operates its own public water supply. See d/e 42, p. 15; d/e 43, p. 8.

Curran-Gardner is a non-profit public water district originally formed under Chapter 111 2/3, Section 189 on September 27, 1966 by the Circuit Court for the Seventh Circuit of Illinois, Sangamon County, Illinois. See d/e 39, p. 2; d/e 42, p. 11. The Sangamon County Circuit Court established Curran-Gardner's boundaries, which were expanded at various times into areas not in question or relevant to this case. See d/e 39, p. 3; d/e 42, p. 11.

Curran-Gardner is empowered, as a public water district, to issue bonds pursuant to 70 ILCS 3705/16. See d/e 39, p. 3; d/e 42, p. 11. Curran-Gardner has issued bonds acquired by the United States Department of Agriculture (USDA), rendering Curran-Gardner indebted to the USDA pursuant to 7 U.S.C. § 1926(a) and (b). See d/e 39, p. 3; d/e 42, p. 11. Curran-Gardner has been

continuously indebted to the USDA without interruption since September 23, 2009. See id.

On June 7, 2010, Springfield and Curran-Gardner entered into an Intergovernmental Cooperation Agreement ("the 2010 Agreement"). See d/e 42, p. 16; d/e 43, p. 11. Springfield entered into the 2010 Agreement after Curran-Gardner obtained its first USDA loan. See id. The 2010 Agreement provided that, "[f]or all times following September 23, 2009, all water customers currently being served water by either [Springfield] or [Curran-Gardner] will remain customers of the same respective water service provider going forward." See id.

The 2010 Agreement further provided that "[a]ll real property annexed to [Springfield] or under [Springfield]'s annexation agreements in existence prior to September 23, 2009, as shown on Exhibit D attached hereto and incorporated herein, except for the Fraase Family and Neff Minor Subdivisions, will be served by [Springfield]." See id. The 2010 Agreement also set forth terms for providing water service going forward to properties that were not being provided water service by Springfield prior to September 23,

2009 or that were not annexed to or under an annexation agreement with Springfield prior to September 23, 2009. See id.

Section 18 of the 2010 Agreement stated that the 2010 Agreement was "intended to be a permanent agreement between the Parties, or to be otherwise for the longest period of time permitted by law" and automatically renewed every five years. See d/e 42, p. 17; d/e 43, p. 11. The 2010 Agreement had no termination provision. See id. The 2010 Agreement's first automatic renewal period commenced on June 7, 2015, and the second five-year renewal term was to begin on June 7, 2020. See id.

On March 12, 2018—over two years before the 2010 Agreement's June 7, 2020 automatic renewal date—Springfield's City Water, Light & Power division and the Office of Corporation Counsel received a letter from an attorney representing Curran-Gardner at the time stating that Curran-Gardner was terminating the 2010 Agreement, effective June 7, 2020. See id. The 2010 Agreement's term expired on June 7, 2020. See d/e 42, p. 17; d/e 43, p. 10.

On August 7, 2023, Curran-Gardner filed a five-Count Complaint in this Court (d/e 1). Curran-Gardner asserts in the

Complaint that Springfield deprived and threatened to further deprive Curran-Gardner of its "federal right under 7 U.S.C. § 1926(b) to be protected from any curtailment or limitation of [its] public water supply services" by "[a]nnex[ing] land within [Curran-Gardner's] state recognized territory" and "[p]rovid[ing] water service to areas within [Curran-Gardner's] territory/boundaries." Id. at pp. 5-6.

Curran-Gardner asserts a violation of 42 U.S.C. § 1983 on the grounds that Springfield acted under color of state law (Count I). See id. Curran-Gardner also seeks: a declaratory judgment as to Curran-Gardner's and Springfield's "rights and legal relations" with respect to Springfield's actions and "Illinois state laws which are preempted by 7 U.S.C. § 1926(b)" (Count II), an injunction "for existing...and threatened violations of 7 U.S.C. § 1926(b)" (Count III), a constructive trust to hold all facilities Springfield used to serve the customers in dispute (Count IV), and damages Curran-Gardner suffered as a result of Springfield serving the customers in dispute (Count V). See id. at pp. 6-8.

In an August 16, 2024 report, Curran-Gardner's water expert identified 54 disputed areas—further divided into a total of 130

"old," "new," and "threatened" disputed areas—at issue in this case. See d/e 42, p. 18; d/e 43, p. 10. Springfield first began providing water service to the "old" disputed areas prior to September 23, 2009. See id. Springfield annexed 123 of the 130 disputed areas prior to September 23, 2009. See id.

## II.    LEGAL STANDARD

### A.  Summary Judgment under Federal Rule of Civil Procedure 56(a)

Summary judgment is proper if the movant shows that no genuine dispute exists as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable trier of fact could find in favor of the non-moving party. Carroll v. Lynch, 698 F.3d 561, 564 (7th Cir. 2012).

When ruling on a motion for summary judgment, the Court must construe facts in the light most favorable to the non-moving party and draw all reasonable inferences in the non-moving party's favor. Woodruff v. Mason, 542 F.3d 545, 550 (7th Cir. 2008). "At summary judgment, 'a court may not make credibility determinations, weigh the evidence, or decide which inferences to

draw from the facts; these are jobs for a factfinder.'" Paz v. Wauconda Healthcare & Rehab. Ctr., LLC, 464 F.3d 659, 664 (7th Cir. 2006).

The movant bears the initial responsibility of informing the Court of the basis for the motion and identifying the evidence the movant believes demonstrates the absence of any genuine dispute of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986); Modrowski v. Pigatto, 712 F.3d 1166, 1168 (7th Cir. 2013) (explaining that Rule 56 "imposes an initial burden of production on the party moving for summary judgment to inform the district court why a trial is not necessary" (internal citation omitted)). After the moving party does so, the non-moving party must then go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986) (quotation and footnotes omitted).

**B. Section 1926(b) of the Agriculture Act of 1961**

The Agriculture Act of 1961 authorizes the United States Department of Agriculture Secretary "to make or insure loans to associations" to provide for "the conservation, development, use,

and control of water" and other key community programs for rural

residents. 7 U.S.C. § 1926(a)(1). Section 1926(b) states in full:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

7 U.S.C. § 1926(b). The Seventh Circuit has interpreted the statute

to "explicitly prohibit[] municipal encroachment on a rural water

association's service area by means of annexation or grant of

private franchise." Jennings Water, Inc. v. City of N. Vernon, Ind.,

895 F.2d 311, 314 (7th Cir. 1989).

The statute's "legislative history confirms that [] Congress

intended a broad reading for section 1926(b)," id. at 315, which

Congress enacted "[t]o ensure that these associations could repay

their loans." Washington Cnty. Water Co., Inc. v. City of Sparta,

Illinois, 77 F.4th 519, 521 (7th Cir. 2023). "[T]he primary

beneficiaries of section 1926(b)'s ban on association service

curtailment are not the associations themselves, but rather, the

[USDA] and the individual rural consumers who would not have inexpensive and reliable water service without [USDA]-supported rural water associations." Jennings, 895 F.2d at 317–18.

Under § 1926(b), Springfield "is barred from selling water to [a disputed area] if: (1) [Curran-Gardner] is a USDA-indebted rural water association, and (2) [Curran-Gardner] has 'provided or made available' service to" the disputed area. See Washington, 77 F.4th at 525 (quoting Jennings, 895 F.2d at 314) (quoting § 1926(b)).

"Although the Seventh Circuit has not explicitly stated how to determine when an association has 'provided or made available' service to a certain area, other circuits apply a two-pronged test" that the Seventh Circuit has administered on appeal. Washington, 77 F.4th at 522 (citing Green Valley Special Util. Dist. v. City of Schertz, 969 F.3d 460, 476–77 (5th Cir. 2020) (en banc)).

"The first prong, referred to as the 'pipes in the ground' prong, asks whether the association has 'water pipes either within or adjacent to the disputed area before the allegedly encroaching association begins providing service to customers in the disputed area.'" Washington, 77 F.4th at 522 (quoting Ross Cnty. Water Co. v. City of Chillicothe, 666 F.3d 391, 399 (6th Cir. 2011)). "The

association seeking § 1926(b) protection must also be capable of providing service to the disputed area within a reasonable time after a request for service occurs." Id.

The second prong asks whether the association has the "legal right under state law to provide water to the disputed area." Id. "To receive protection under § 1926(b), [Curran-Gardner] must show that it 'has a legal right under state law' to serve" the disputed areas. Id. at 525 (internal citations omitted).

Neither party disputes that Curran-Gardner is a rural water association. See d/e 39, p. 11; d/e 42, p. 21. The Court addresses the parties' contentions as to the remaining prongs in turn.

### III.   ANALYSIS

#### A. As to the "Old" Disputed Areas, Curran-Gardner Cannot Establish It Was a USDA-Indebted Rural Water Association.

Springfield first argues that, because it began providing water to the "old" disputed areas before Curran-Gardner obtained its first USDA loan, Curran-Gardner "is not entitled to [§ 1926(b)]'s protections with respect to any" of the "old" disputed areas and Springfield "is therefor[e] entitled to summary judgment in its favor with respect to all of the them." See d/e 42, p. 24.

Page **10** of **43**

Curran-Gardner argues in response that the Tenth Circuit Court of Appeals has rejected that same argument and "held that <u>continuing</u> to provide water service to areas after the USDA indebted water district obtained its loan, violates § 1926(b)." <u>See</u> d/e 43, p. 13 (emphasis in original) (citing <u>Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow</u>, 191 F.3d 1192, 1206 (10th Cir. 1999) and <u>Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester</u>, 358 F.3d 694, 712 (10th Cir. 2004)).

In <u>Sequoyah County Rural Water District No. 7 v. Town of Muldrow</u>, 191 F.3d 1192 (10th Cir. 1999), the plaintiff rural water district's predecessor entity was indebted to the USDA starting on April 14, 1969; purchased or paid off all of its then-outstanding indebtedness to the USDA on May 5, 1989; and then took out another USDA loan on September 28, 1994. <u>See</u> <u>id.</u> at 1194-95. The defendants, the Town of Muldrow and the Muldrow Public Works Authority, began providing water service to certain customers within the plaintiff rural water district's territory sometime between May 5, 1989 and September 28, 1994. <u>Id.</u> at 1195. However, the plaintiff rural water district did not allege that the defendants

Page **11** of **43**

provided water within its territory <u>before</u> the plaintiff rural water district <u>first</u> became indebted to the USDA on April 14, 1969.

The Tenth Circuit found that, "even if a water association has repurchased its loan and discharged its debt to the government, encroachments which occurred during the term of the loan are protected." <u>Id.</u> at 1200. Therefore, while the plaintiff rural water district could recover for encroachments occurring or continuing after September 28, 1994, the plaintiff rural water district was "not entitled to recover for any encroachments occurring or continuing between May 5, 1989, and September 28, 1994, because it was not indebted to the [USDA] at the time[.]" <u>Id.</u> at 1206.

The Tenth Circuit found "no reason why a water association which repurchases or otherwise repays its debts should lose the protection to which it was entitled during the period of indebtedness":

> To so hold would defeat the purpose of offering the protection because a water association which repurchased or paid off its debt but which otherwise met the statutory requirements would have no recourse for encroachments that <u>occurred or began while</u> it was indebted to the government. Such a rule clearly would defy the language of § 1926(b), which expressly prohibits encroachments "during the term of such loan." 7 U.S.C. § 1926(b). This rule would also create a disincentive for water districts to

repay their loans and would encourage municipalities and other competitors to encroach without concern for any resulting liability.

Id. at 1200 (emphasis added).

In Pittsburg County Rural Water District No. 7 v. City of McAlester, 358 F.3d 694 (10th Cir. 2004), the plaintiff rural water district was indebted to the USDA from 1967 until it repurchased its outstanding debt to the USDA on February 24, 1989. See id. at 701. On June 15, 1994, the plaintiff rural water district entered into another loan agreement with the USDA. Id.

The defendant, the City of McAlester, allegedly first served three groups of water customers at three different times: "during the first period of [the plaintiff rural water district's USDA] indebtedness, July 3, 1967 to February 24, 1989;" "between February 24, 1989 and June 15, 1994, when [the plaintiff rural water district] was not in debt to the federal government;" and "after the June 15, 1994 federal loan, when [the plaintiff rural water district] incurred its latest debt to the federal government." Id. at 704.

The Tenth Circuit in Pittsburg first cited its prior finding that "[t]he fact that a municipality had provided service to those

Page **13** of **43**

properties prior to the [USDA] loan was no bar in Sequoyah to claims arising out of a city's service during the period of indebtedness." Id. at 712. The Tenth Circuit then found that "all § 1926 claims based on service by McAlester to customers within the limitations period were not otherwise barred by the fact that McAlester was serving those customers prior to the 1994 loan"—the second of the plaintiff rural water district's two distinct USDA loans. Id. at 713.

This Court finds that Sequoyah and Pittsburg are both distinguishable from the facts of this case. In both Tenth Circuit cases, the water districts alleged violations of § 1926(b) that occurred during or between distinct periods of the water districts' indebtedness to the USDA, not before the water districts were ever indebted to the USDA. The Tenth Circuit's consistent finding—that the temporary lapse in a water district's subsequently resumed indebtedness to the USDA did not exempt § 1926(b)'s protections— does not dictate the situation here, where the parties agree that Springfield first began providing water service to the "old" disputed areas prior to September 23, 2009, when Curran-Gardner first became indebted to the USDA as it continuously has been ever

since. See d/e 39, p. 3; d/e 42, pp. 11, 18; d/e 43, p. 10. The "old" disputed areas are not "encroachments that occurred or began while [Curran-Gardner] was indebted to the government." See Sequoyah, 191 F.3d at 1200.

However, Public Water Supply District No. 3 of Laclede County, Missouri v. City of Lebanon, Missouri, 605 F.3d 511, (8th Cir. 2010), which both parties cited in their respective pleadings, is instructive. See d/e 39, p. 9; d/e 42, pp. 13, 15, 16. In Laclede, the Eighth Circuit noted that "§ 1926(b) includes a specific timing element," as the phrase "during the term of such loan" in § 1926(b) "limits the scope of a rural district's exclusive provider status to the period during which the qualifying federal loan is outstanding." Id. at 517; see also 7 U.S.C. § 1926(b).

The Eighth Circuit found that the § 1926(b) "terms' ordinary meanings and their particular usages within the statute are inconsistent with the [Laclede] District's argument that it is entitled to take [disputed] customers whom the City [of Lebanon, Missouri] started serving before the [Laclede] District obtained the USDA loan," and instead "suggest that a city curtails or limits service within the meaning of § 1926(b) when it initially provides service to

a customer, not when it continues to do so." Id. at 516. The Eighth

Circuit reasoned:

> If § 1926(b) permitted rural districts to capture customers that a city began serving before a rural district obtained a qualifying federal loan, cities would not be willing to invest in the necessary infrastructure to serve customers within a rural district's boundaries because such investments would be rendered worthless by a rural district that obtains a qualifying federal loan. Creating such a disincentive would undermine the purpose of encouraging rural utility development. Additionally, rural districts can continue to use § 1926(b) to protect their exclusive right to serve their existing customer base during the time of the qualifying federal loan, thereby ensuring the continued security of the loan. In sum, the plain language of the statute, the rule in favor of giving effect to all terms in the statute, and our analysis of the statute's purposes all confirm that the City did not violate § 1926(b) merely by continuing to provide service to those customers it began serving before the District obtained the USDA loan.

Id. at 518.

The Court finds the Eighth Circuit's reasoning applicable to the facts of the case at bar. The parties agree that Springfield first began providing water service to the "old" disputed areas prior to September 23, 2009, when Curran-Gardner first became indebted to the USDA. See d/e 39, p. 3; d/e 42, pp. 11, 18; d/e 43, p. 10. Applying § 1926(b)'s protections retroactively to precede a water association's USDA indebtedness would contravene Congress'

professed intent in enacting § 1926(b): to foster rural resource accessibility. See Laclede, 605 F.3d at 518; see also Jennings, 895 F.2d at 317–18.

Therefore, the Court finds that Curran-Gardner was not a "USDA-indebted rural water association" with regard to the "old" disputed areas as required to satisfy § 1926(b) and bar Springfield from selling water to the "old" disputed areas. See Washington, 77 F.4th at 525 (quoting Jennings, 895 F.2d at 314) (quoting § 1926(b)).

### B. As to the "New" and "Threatened" Disputed Areas, a Question of Material Fact Exists Regarding Whether Curran-Gardner Had a Legal Right to Provide Them Water Services Under Illinois Law Before Becoming Indebted to the USDA.

#### 1. 65 ILCS 5/11-151-3 (1969).

Both parties agree that Division 151 of Article 11 of the Illinois Municipal Code, titled "Municipality Relationship to Public Water District," see 65 ILCS 5/11-151-1 et seq., applies to Curran-Gardner's purported legal right to provide water services to the disputed areas in this case. See d/e 39, pp. 13-14, d/e 42, p. 25. Section 11-151-3 consists of two paragraphs, which read in full:

Page **17** of **43**

> Except as otherwise provided in this Article, no municipality may furnish water or sanitary sewer service to any <u>territory situated within a public water district</u> and more than one mile from the corporate limits of the municipality without the district's consent. Nothing in this Section affects the performance by the municipality of any other function in which the district is not engaged.
>
> A municipality that operates a public water supply and furnishes water service has the exclusive right, as against a public water district, to serve residents in the territory within one mile or less of the corporate limits of the municipality but may consent to the district's providing service to such residents.

65 ILCS 5/11-151-3 (1969) (emphasis added).

i.    **"Territory situated within a public district."**

Curran-Gardner first argues that the term "territory" in Section 11-151-3 "refer[s] to the geographical boundaries of a water district, and those boundaries do not change as the result of an annexation by a municipality" such that "municipal annexations within the water district's boundaries do not reduce the district's geographical boundaries." d/e 39, pp. 13-14.

Springfield argues that, although Curran-Gardener's assertion "may be true, it is irrelevant because, regardless of [Curran-Gardner]'s boundaries, Section 11-151-3 grants [Springfield] the exclusive right to serve all of the water customers in the Disputed

Page **18** of **43**

Areas notwithstanding the fact that those customers are also located within [Curran-Gardner's] water service territory." d/e 42, p. 27.

Curran-Gardner cites to Section 12 of the Illinois Public Water District Act in support of its proposition that "the service area of a water district is determined upon its creation by Court Order establishing the water district's geographical boundaries, i.e., Curran-Gardner has the legal right to provide water service within its geographical boundaries." d/e 39, p. 13; see also 70 ILCS 3705/12.

Section 12 of the Illinois Public Water District Act is titled "Acquisition and operation of waterworks properties; rates and charges" and states, in relevant part:

> The board of trustees of any public water district organized hereunder is authorized to acquire either by purchase or condemnation, and to maintain, operate and to improve and extend such waterworks properties within such district as the board of trustees may determine to be conducive to the preservation of public health, comfort and convenience of such area, and shall have power to make, enact and enforce all needful rules and regulations in connection with the acquisition of any waterworks properties or to the construction thereof, the improvement, extension, management, maintenance, operation, care, protection and the use thereof[.]

70 ILCS 3705/12 (1951) (emphasis added).

Section 12 of the Illinois Public Water District Act authorizes a water district's board of trustees to acquire and operate waterworks properties within the water district; it does not guarantee the water district a particular water service area relative to the water district's geographical borders. See id. As relevant here, Section 12 uses but does not define the phrase "within such district," whether to mean the water district's geographical boundaries, the water district's service area, or otherwise. See id.

Therefore, the Court finds no need or reason to adopt Curran-Gardner's proposed definition of "within a public water district" in Section 11-151-3 to mean within the geographical boundaries of a water district as originally created.

ii.   **"Territory situated within a public water district and more than one mile from the corporate limits of the municipality without the district's consent."**

As previously noted, Section 11-151-3 reads in full:

Except as otherwise provided in this Article, no municipality may furnish water or sanitary sewer service to any territory situated within a public water district and more than one mile from the corporate limits of the municipality without the district's consent. Nothing in this Section affects the performance by the municipality of any other function in which the district is not engaged.

A municipality that operates a public water supply and furnishes water service has the exclusive right, as against a public water district, to serve residents in the territory within one mile or less of the corporate limits of the municipality but may consent to the district's providing service to such residents.

65 ILCS 5/11-151-3 (1969) (emphasis added).

Curran-Gardner argues that the first paragraph describes "two discrete and separate areas": "one is territory inside the boundaries of the water district and the other is territory beyond one mile from the corporate limits of the [municipality]." d/e 43, pp. 13-14 (emphasis in original). Curran-Gardner argues that "[b]oth areas are applicable," though not specifying to what, because Curran-Gardner "has the legal authority to sell water both inside and beyond its boundaries established by the Sangamon County Circuit Court." Id.; see also 70 ILCS 3705/10 (1945). Curran-Gardner cites to Section 10 of the Illinois Public Water District Act, which states in full:

Any public water district formed hereunder shall have the right to supply water to any municipality, political subdivision, private person or corporation located outside the limits of said district upon such payment, terms and conditions as may be mutually agreed upon, provided the water is delivered by such district to such party or parties at the corporate limits of such district or from such

Page **21** of **43**

waterworks properties of such district located outside the district that have been constructed or acquired as necessary and incidental to the furnishing of water to the inhabitants of said district.

70 ILCS 3705/10 (1945) (emphasis added).

Springfield argues that the phrase "and more than one mile from the corporate limits" in Section 11-151-3 "merely modifies" the phrase "territory within a public water district" in the statute. See d/e 45, p. 7. Springfield argues that such a definition is consistent with the second paragraph of Section 11-151-3 granting a municipality the exclusive right "to serve residents in the territory within one mile or less of the corporate limits of the municipality" (see id.) and Section 40 of the Illinois Public Water District Act making clear not to "authorize[] a public water district to provide water service to residents in territory within one mile or less of the corporate limits of a municipality that operates a public water supply and furnishes water service" (see 70 ILCS 3705/40). See d/e 45, p. 7.

Curran-Gardner provides, and the Court finds, no reason why the Illinois Legislature would require a municipality to gain a public water district's consent to furnish water to territory more than one

mile from the municipality's corporate limits if that territory were not <u>also</u> "within [the] public water district," however defined. <u>See</u> 65 ILCS 5/11-151-3 (1969). A water district having "the legal authority to sell water both inside and beyond its boundaries" (<u>see</u> d/e 39, pp. 13-14), whether of service or geography, does not preclude a municipality from <u>also</u> "furnish[ing] water…to any territory situated within a public water district and more than one mile from the corporate limits of the municipality" with the district's consent. <u>See</u> 65 ILCS 5/11-151-3 (1969).

Therefore, pursuant to the statute's plain language, the Court interprets the first paragraph of Section 11-151-3 to bar municipalities from furnishing water to "any territory" that is "situated" <u>both</u> "within a public water district" <u>and</u> "more than one mile from the corporate limits of the municipality"—unless the municipality first acquires the public water district's consent to furnish water to such territory. <u>See</u> 65 ILCS 5/11-151-3 (1969).

### iii. "Territory within one mile or less of the corporate limits of the municipality."

The second and final paragraph of Section 11-151-3 states:

A municipality that operates a public water supply and furnishes water service has the exclusive right, as against

Page **23** of **43**

a public water district, to serve residents in the territory within one mile or less of the corporate limits of the municipality but may consent to the district's providing service to such residents.

65 ILCS 5/11-151-3 (1969) (emphasis added).

Springfield argues that Section 11-151-3 "explicitly grants certain municipalities, like [Springfield], the exclusive right to provide water service to customers within or near its boundaries, regardless of whether those customers are also located within a public water district's boundaries." See d/e 42, p. 25.

Curran-Gardner argues that Section 11-151-3 referencing "territory within one mile or less of the corporate limits of the municipality," see 65 ILCS 5/11-151-3, "[t]o avoid an absurd result ... must mean an area situated outside/beyond the boundaries of the water district ... because water districts in Illinois have the legal right to sell water both within and beyond their Illinois circuit court established boundaries." d/e 43, p. 14. Curran-Gardner cites in support Section 10 of the Illinois Public Water District Act, see id., which states in full:

Any public water district formed hereunder shall have the right to supply water to any municipality, political subdivision, private person or corporation located outside the limits of said district upon such payment, terms and

Page **24** of **43**

conditions as may be mutually agreed upon, provided the water is delivered by such district to such party or parties at the corporate limits of such district or from such waterworks properties of such district located outside the district that have been constructed or acquired as necessary and incidental to the furnishing of water to the inhabitants of said district.

70 ILCS 3705/10 (1945) (emphasis added).

The Court notes that, assuming a water district can serve inside and outside its "limits" as Curran-Gardner states, then the fact standing alone that an area is inside or outside those limits would not impact a water district's right to serve that area. See id. Further, the Illinois Public Water District Act explicitly dictates at least one thing that a water district cannot do, as against a municipality, within the water district's boundaries. Specifically, Section 1 of the Act, which authorizes public water districts' creation, states, in relevant part: "[A]ny public water district created under this Act shall not have authority to construct, acquire, maintain or operate a water distribution system in any city, village or incorporated town located within such district." 70 ILCS 3705/1 (1951). Therefore, the Sangamon County Circuit Court created Curran-Gardner's geographic borders in 1966 within an existing

legal framework that prioritized municipalities' rights in certain ways over public water districts' rights.

Curran-Gardner also notes that "the area inside [its] boundaries are further regulated by" Section 11-151-4, titled "Annexation of all of territory served by public water district," and Section 11-151-5, titled "Annexation of part of territory served by public water district; contracts." See d/e 43, p. 14; see also 65 ILCS 5/11-151-4; 65 ILCS 5/11-151-5. As neither party argues that Springfield annexed all of the territory served by Curran-Gardner, the Court considers Section 11-151-5, which states, in relevant part:

> If a municipality annexes part, but not all of the territory of a public water district, sanitary sewer district, or both, the corporate authorities of the municipality and of the district may enter contracts providing for the division and allocation of duplicate and overlapping powers, functions and duties between the 2 entities and for the use, management, control, purchase, conveyance, assumption and disposition of the properties, assets, debts, liabilities and obligations of the district. The corporate authorities of a district and such a municipality may also enter agreements providing for the operation by the municipality of the district's utility systems and other properties or for the transfer, conveyance or sale of those systems and properties to the municipality.

65 ILCS 5/11-151-5 (emphasis added).

Curran-Gardner argues that Section 11-151-5 provides that a municipality may take over service by agreement, in which case "there must be compensation to the public water district," which "should include the value of the area and facilities which the municipality acquires." d/e 39, p. 14. Further, Curran-Gardner argues, Section 11-151-5 "allows for partial annexation, but does not grant any rights to the annexing city, to provide water service inside the District's boundaries absent an agreement described in 5/11-151-5." d/e 43, p. 17 (emphasis in original).

However, Curran-Gardner does not explain why these optional contracting and agreement opportunities in the wake of partial annexation run counter to a municipality's exclusive right, dictated two sections prior in Section 11-151-3, "to serve residents in the territory within one mile or less of the corporate limits of the municipality," even if within the bounds of a water district. See 65 ILCS 5/11-151-3 (1969).

The Court finds that Sections 11-151-3 and 11-151-5, when read together, dictate a municipality's and public water district's rights to serve water relative to the municipality's corporate

boundaries and annexation power—in other words, oriented around the municipality.

The first paragraph of Section 11-151-3 dictates that, within a water district and <u>over a mile</u> from a municipality's corporate boundary, the <u>municipality</u> cannot serve water without the <u>district</u>'s consent. <u>See</u> <u>id.</u> This language does not bar a municipality from serving water elsewhere within a water district.

A parallel reading of the second paragraph of Section 11-151-3 complements the first paragraph—dictating that, within a water district and <u>a mile or less</u> from a municipality's corporate boundary, the <u>district</u> cannot serve water without the <u>municipality's</u> consent. <u>See</u> <u>id.</u> This would also align with Section 11-151-5 allowing <u>both</u> entities in the wake of partial-annexation to contract over "duplicate and overlapping powers, functions and duties" as well as for the <u>district's</u> "properties, assets, debts, liabilities and obligations," but only allowing the entities to enter agreements regarding the <u>municipality's</u> "operation" and/or acquisition of the <u>district's</u> "utility systems and other properties." <u>See</u> 65 ILCS 5/11-151-5 (emphasis added).

Therefore, the Court interprets the second paragraph of Section 11-151-3 to grant a municipality: 1) "the exclusive right" to serve residents in territory located "within one mile or less of the corporate limits of the municipality," whether or not that territory is "within the water district" and 2) the option to "consent to the district's providing service to such residents" in such territory. See 65 ILCS 5/11-151-3 (1969).

### iv.  Policy and Preemption Arguments.

Curran-Gardner raises two policy arguments, arguing first that, under Springfield's proposed reading of Section 11-151-3,

> [O]ver time a water district's right to sell water would eventually disappear, even losing the right to sell water to its existing customers within its boundaries, because of municipal annexation. Under [Springfield]'s interpretation, [Curran-Gardner] would have no legal right to provide water service inside its boundaries, if the area is within one mile of city limits, even if [Springfield] had no intention to serve the area, even if [Springfield] lacked the ability to provide water service within the one mile, and even if [Curran-Gardner] was already serving in the area annexed.

d/e 43, pp. 14-15 (emphasis in original).

Springfield, citing Section 11-151-5, argues in response that, "[i]f a municipality is unable or unwilling to provide water service to

Page **29** of **43**

certain customers within its exclusive territory, it can grant the district the right to do so through" an intergovernmental cooperation agreement. d/e 45, p. 8.

In Curran-Gardner's proposed hypothetical, all territory within a water district's boundaries would be "within one mile or less of the corporate limits of the municipality," such that the municipality had "the exclusive right, as against a public water district, to serve" all territory and residents within the water district's boundaries, but the municipality declined to "consent to the district's providing service to such residents." See 65 ILCS 5/11-151-3 (1969). Assuming this scenario was due to partial annexation, as opposed to unusual planning, both entities could then contract over "duplicate and overlapping powers, functions and duties" as well as for the district's "properties, assets, debts, liabilities and obligations" and enter agreements regarding the municipality's "operation" and/or acquisition of the district's "utility systems and other properties." See 65 ILCS 5/11-151-5.

The Court agrees with Springfield. Not only does Curran-Gardner argue that this outcome "would" happen without supporting that likelihood, but Sections 11-151-3 and 11-151-5

explicitly govern the partial and full water district annexation that would cause such an outcome. Further, it would be antithetical for a municipality growing by annexation to essentially limit its own active expansion by creating a one-mile buffer around itself that lacked water service because the municipality could not itself provide it <u>and</u> declined to contract to provide it. Finally, Curran-Gardner does not argue that it or another water district has experienced this or a similar scenario. The Court declines to override the Illinois Legislature's legal framework governing municipalities' and public water districts' rights to accommodate an unlikely hypothetical.

Next, Curran-Gardner argues that:

> [Springfield]'s argument [on how to interpret Section 11-151-3] would allow [Springfield] to take the densest and highest net revenue producing areas (net revenue derived from water sales), by annexing densely populated areas within a water district's boundaries, leaving behind the sparsely populated low net revenue producing areas, and never trigger any obligation to assume and pay all of the district's debt and never assume the obligation to provide water service to sparsely populated areas.

d/e 43, p. 16. Curran-Gardner then cites to a Fifth Circuit Court of Appeals case stating that "annexing and condemning those parts of a water association with the highest population density (and thus

the lowest per-user cost) would undermine Congress's purpose [in enacting § 1926(b)] of facilitating inexpensive water supplies for farmers and other rural residents and protecting those associations' ability to repay their [USDA] debts." See id. at n.7, see also City of Madison, Miss. v. Bear Creek Water Ass'n., Inc., 816 F.2d 1057, 1060 (5th Cir. 1987).

Springfield argues such a scenario is "equally unrealistic" on the grounds that water districts "serve rural, unpopulated areas"— or they would otherwise "not be able to participate in the USDA loan program that is the source of its Section 1926(b) rights"—and "generally lack the capacity to serve 'densely populated areas.'" d/e 45, p. 8. Springfield further argues that "nothing in the Municipal Code or the Public Water District Act places any limitation on the population density of an area within a water district's territory that a municipality may annex." Id.

The Court again agrees with Springfield. Curran-Gardner cites no Illinois statute or regulation allowing a municipality to annex only areas with certain net revenue derived from water sales; requiring a municipality to annex some but not all of a public water district to trigger obligations to assume and pay all of the district's

debt; or directing a municipality to provide water service to sparsely populated areas. While the policy goals Curran-Gardner raises may reflect Congress' intent in enacting § 1926(b), that federal statute is not at issue in determining whether Curran-Gardner has the "legal right under state law to provide water to the disputed area." Washington Cnty. Water Co., Inc. v. City of Sparta, Illinois, 77 F.4th 519, 522 (7th Cir. 2023) (emphasis added).

Curran-Gardner also makes a preemption argument, specifically, that § 1926(b) preempts Section 11-151-3 if it grants Springfield "the exclusive right to sell water inside [Curran-Gardner's] boundaries." d/e 43, p. 20. Curran-Gardner cites to the Tenth Circuit noting in Pittsburg that "where the federal § 1926 protections have attached, § 1926 preempts local or 'state law [that] can be used to justify a municipality's encroachment upon disputed area in which an indebted association is legally providing service under state law.'" Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester, 358 F.3d 694, 715 (10th Cir. 2004).

However, the state law at issue, Section 11-151-3, impacts whether Curran-Gardner was "legally providing service under state law" in the disputed areas, as Section 1926(b) requires—it does not

"justify [Springfield's alleged] encroachment upon disputed area[s]."

See Pittsburg, 358 F.3d at 715. Thus, § 1926(b) does not preempt

Section 11-151-3 as Curran-Gardner asserts.

### 2. A Question of Material Fact Exists as to Whether the "New" and "Threatened" Disputed Areas Were Located Over One Mile from Springfield's Corporate Boundaries Prior to September 23, 2009.

Curran-Gardner argues that it "has the legal right to provide

water service within its geographical boundaries," citing Section 12

of the Illinois Public Water District Act. d/e 39, pp. 13-14. As

discussed above, Section 12 of the Act authorizes a water district's

board of trustees to acquire and operate waterworks properties

within the water district; it does not guarantee the water district a

particular water service area relative to the water district's

geographical borders. See 70 ILCS 3705/12 (1951).

Further, a sister district court in this Circuit rejected a similar

argument in Tri-Township Water District v. City of Trenton, Illinois,

576 F. Supp. 3d 591, 593 (S.D. Ill. 2021), dismissed, No. 22-1071,

2022 WL 18401372 (7th Cir. May 18, 2022). In Tri-Township, the

district court assessed Tri-Township Water District's claim

pursuant to 7 U.S.C. § 1926(b) that it had exclusive jurisdiction to

serve several disputed properties within its boundaries as established by the judicial order creating the water district. See id.

Tri-Township argued that 7 U.S.C. § 1926(b) applied and preempted Section 11-151-3, while the Defendant City of Trenton, Illinois, countered that the only relevant fact was that on the day Tri-Township was created by judicial order, the disputed area was within one mile of the City of Trenton's corporate boundary. Id. The district court found:

> The fact that the Order setting forth [Tri-Township]'s jurisdictional boundaries included the disputed area is not sufficient to circumvent state law [Section 11-151-3]. Indeed, the relevant statute clearly presumes such conflict may arise as it provides that a municipality may consent to a water district providing service to residents situated in territory within one mile or less of its corporate limits. Because the Properties were not part of [Tri-Township]'s service area pursuant to state statute at the time [Tri-Township] became indebted to the federal government, § 1926(b) cannot protect the same from encroachment or curtailment. Section 1926(b) only protects the service area that Plaintiff had a legal right to serve at the time.

Id. at 597–98.

This Court agrees with the Tri-Township court's reasoning. Curran-Gardner must prove that the "new" and "threatened" disputed areas were part of its service area pursuant to Illinois statute—not simply pursuant to the judicial order creating Curran-

Gardner—at the time that Curran-Gardner became indebted to the USDA and thus received § 1926(b)'s protections.

Springfield argues that Curran-Gardner "never had the legal right, under Illinois law, to provide water service to the Disputed Areas once [Springfield] annexed them or territory within one mile of them without [Springfield's] agreement" as required under the second prong of the test for whether Curran-Gardner provided or made available service to the disputed areas. See d/e 42, p. 24.

Under the second paragraph of Section 11-151-3,

A municipality that operates a public water supply and furnishes water service has the exclusive right, as against a public water district, to serve residents in the territory within one mile or less of the corporate limits of the municipality but may consent to the district's providing service to such residents.

65 ILCS 5/11-151-3 (1969). The parties agree that Springfield operates its own public water supply that furnishes water service. See d/e 42, p. 15; d/e 43, p. 8. Neither party argues that Springfield "consent[ed] to [Curran-Gardner]'s providing service to" residents within one mile or less of Springfield's corporate limits, see 65 ILCS 5/11-151-3 (1969), on or before September 23, 2009— the date on which Curran-Gardner first became indebted to the

Page **36** of **43**

USDA and must have had a legal right to serve those areas to receive § 1926(b)'s protections. See d/e 39, p. 3; d/e 42, pp. 11, 18; d/e 43, p. 10; see also Washington Cnty. Water Co., Inc. v. City of Sparta, Illinois, 77 F.4th 519, 522 (7th Cir. 2023); see also Tri-Township, 576 F. Supp. 3d at 597-98 ("Section 1926(b) only protects the service area that Plaintiff had a legal right to serve at the time.").

Therefore, Springfield "has the exclusive right, as against [Curran-Gardner], to serve residents in the territory within one mile or less of the corporate limits of [Springfield]" pursuant to Section 11-151-3. See 65 ILCS 5/11-151-3 (1969). However, it is not clear from the parties' agreed facts which, if any, of the "new" and "threatened" disputed areas are located "within one mile or less of the corporate limits of [Springfield]," see id., as those limits existed on September 23, 2009—the date on which Curran-Gardner first became indebted to the USDA and must have had a legal right to serve those areas in order to receive § 1926(b)'s protections. See d/e 39, p. 3; d/e 42, pp. 11, 18; d/e 43, p. 10; see also Washington, 77 F.4th at 522; see also Tri-Township, 576 F. Supp. 3d at 597-98

Page **37** of **43**

("Section 1926(b) only protects the service area that Plaintiff had a legal right to serve at the time.").

Springfield states in its First Amended Answer and Affirmative Defenses that, "[a]t the time [Curran-Gardner's USDA] loan was obtained, the Customers in Dispute were situated within 1 mile of the then corporate limits of" Springfield. d/e 37, p. 8. Springfield's proposed fact # 23 asserts that "[a]ll 130 of the Old, New, and Threatened Disputed Areas were annexed by [Springfield] or were located within one mile of [Springfield]'s corporate boundaries prior to September 23, 2009." d/e 42, p. 18 (emphasis added). Springfield cites its Exhibit 2—the June 9, 2025 declaration of Michael T. Johnson, the Superintendent of Water Distribution and Engineering Operations for City Water, Light & Power, a department of the City of Springfield, Illinois. Id. at p. 105. Johnson stated in his declaration that "123 of the disputed areas were fully within [Springfield]'s corporate boundaries," "four disputed areas were all within one mile of [Springfield's] City Limits as [Springfield's] City Limits existed on September 23, 2009," and Springfield "does not currently provide water service to...three disputed areas." Id. at pp. 104-105.

In response to Springfield's proposed fact # 23, Curran-Gardner states, "Denied in part and Immaterial. September 23, 2009 is not the correct date. [Curran-Gardner's] legal right to serve the Disputed Area was established when [Curran-Gardner] was created in 1966." d/e 43, p. 11. Curran-Gardner cites paragraph 2 of its Exhibit 1, the declaration of Todd R. Folder, which states in full:

> Curran-Gardner is a non-profit public water district originally formed under Chapter 111 2/3, Section 189 on September 27, 1966, by the Circuit Court for the Seventh Circuit of Illinois, Sangamon County, Illinois (the "Sangamon [County] Circuit Court"). Ex. 21 is a true and correct copy of the Petition and Order relating to the creation of Curran-Gardner.

d/e 39, p. 22.

Some, or even all, of the "new" and "threatened" disputed areas may be "within one mile of [Springfield] City Limits as the City Limits existed on September 23, 2009," d/e 42, pp. 104-105, in which case Curran-Gardner lacked the "legal right under state law to provide water to" those "new" or "threatened" disputed areas under Section 11-151-3. Washington Cnty. Water Co., Inc. v. City of Sparta, Illinois, 77 F.4th 519, 522 (7th Cir. 2023). But the fact, standing alone, that Springfield annexed a disputed area in a

partial annexation of Curran-Gardner does not grant Curran-Gardner nor preclude Curran-Gardner from having a legal right to serve that area. Section 11-151-5, titled "Annexation of part of territory served by public water district; contracts," allows both a municipality and a water district to contract and enter agreements as to overlapping water service; it does not grant either party water service rights, exclusive or otherwise. See 65 ILCS 5/11-151-5.

Therefore, the Court finds that there remains a question of material fact as to whether the "new" and "threatened" disputed areas, whether or not Springfield had annexed them, were located within one mile of Springfield's corporate boundaries on September 23, 2009—such that, under Section 11-151-3, Curran-Gardner lacked the "legal right under state law to provide water to the disputed area" as required to receive § 1926(b)'s protections. See Washington, 77 F.4th at 522; see also Tri-Township, 576 F. Supp. 3d at 597-98 ("Section 1926(b) only protects the service area that Plaintiff had a legal right to serve at the time.").

In sum, under § 1926(b), Springfield "is barred from selling water to [the disputed areas] if: (1) [Curran-Gardner] is a USDA-indebted rural water association, and (2) [Curran-Gardner] has

'provided or made available' service to" the disputed areas. See

Washington, 77 F.4th at 525 (quoting Jennings, 895 F.2d at 314)

(quoting § 1926(b)). The parties agree that Curran-Gardner has

been continuously indebted to the USDA without interruption since

September 23, 2009. See d/e 39, p. 3; d/e 42, p. 11.

As to the "old" disputed areas, the parties agree Springfield

first began providing water service to the "old" disputed areas prior

to September 23, 2009. See d/e 39, p. 3; d/e 42, pp. 11, 18; d/e

43, p. 10. In light of Public Water Supply District No. 3 of Laclede

County, Missouri v. City of Lebanon, Missouri, 605 F.3d 511, (8th

Cir. 2010)—which both parties cited in their respective pleadings,

see d/e 39, p. 9; d/e 42, pp. 13, 15, 16—the Court finds that

Curran-Gardner was not a "USDA-indebted rural water association"

with regard to the "old" disputed areas as required to satisfy

§ 1926(b) and bar Springfield from selling water to the "old"

disputed areas. See Washington, 77 F.4th at 525 (quoting Jennings,

895 F.2d at 314). Since all of Curran-Gardner's claims stem from

§ 1926(b), Springfield's Cross Motion for Summary Judgment (d/e

41) is GRANTED in part and Curran-Gardner's Motion for Partial

Summary Judgment (d/e 38) is DENIED, only as to the "old" disputed areas.

As to the "new" and "threatened" disputed areas, a question of material fact exists as to whether Curran-Gardner had a legal right under Illinois law to serve the "new" and "threatened" disputed areas, so as to have "'provided or made available' service to" those areas as required to satisfy § 1926(b) and bar Springfield from selling water to the "new" and "threatened" disputed areas. See Washington, 77 F.4th at 525 (quoting Jennings, 895 F.2d at 314). Since all of Curran-Gardner's claims stem from § 1926(b), Springfield's Cross Motion for Summary Judgment (d/e 41) is DENIED in part and Curran-Gardner's Motion for Partial Summary Judgment (d/e 38) is DENIED, only as to the "new" and "threatened" disputed areas.

## IV.   CONCLUSION

For the reasons stated, Plaintiff Curran-Gardner Townships Public Water District's Motion for Partial Summary Judgment (d/e 38) is DENIED and Defendant City of Springfield's Cross Motion for Summary Judgment (d/e 41) is GRANTED in part and DENIED in part.

Plaintiff Curran-Gardner Townships Public Water District's pending motions in limine (d/e 48), (d/e 49), (d/e 50), (d/e 51), (d/e 52), (d/e 53), (d/e 55), and (d/e 57) and Motion to Bifurcate Trial (d/e 58) are DISMISSED as MOOT with leave to refile pursuant to the deadlines for the parties' trial date.

**ENTERED: March 16, 2026.**

**FOR THE COURT:**

/s/ Sue E. Myerscough

**SUE E. MYERSCOUGH**
**UNITED STATES DISTRICT JUDGE**